1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                  FOR THE DISTRICT OF OREGON

11   COLLEGENET, INC., a Delaware    )
     corporation,                    )
12                                   )
                      Plaintiff,     )   Nos. CV-02-484-HU (LEAD CASE)
13                                   )        CV-02-1359-HU
          v.                         )
14                                   )
     APPLYYOURSELF, INC., a          )   OPINION & ORDER
15   Delaware corporation,           )
                                     )
16                    Defendant.     )
     _____)
17
     John D. Vandenberg
18   Michael N. Zachary
     Scott E. Davis
19   KLARQUIST SPARKMAN, LLP
     121 S.W. Salmon Street, Suite 1600
20   Portland, Oregon 97204

21        Attorneys for Plaintiff

22   Kathleen C. Bricken
     GARVEY SCHUBERT BARER
23   121 S.W. Morrison Street
     Portland, Oregon 97204-3141
24
     J. Michael Jakes
25   Robert F. Shaffer
     FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
26   901 New York Avenue, N.W.
     Washington, D.C. 20001
27
          Attorneys for Defendant
28

1 - OPINION & ORDER

HUBEL, Magistrate Judge:

These consolidated cases involve two patents relating to an on-line application system.  Case number CV-02-484-HU concerns plaintiff's patent number 6,345,278 ("the '278 patent").  Case number CV-02-1359-HU concerns plaintiff's patent number 6,460,042 ("the '042 patent").  The '042 patent is a continuation patent of the '278 patent.

After an appeal to the Federal Circuit following a September 2003 jury trial and post-trial motion litigation, and a remand back to this Court, the case was set for trial again on October 30, 2006.  As a result of various rulings and two stipulations[1] filed between the time the case was remanded to this Court from the Federal Circuit, and the October 2006 trial date, the single issue set for trial in October 2006 was ordinary damages for defendant's infringement of the '042 patent from September 10, 2003, to September 18, 2005.  Resolution of the other issues in the case was deferred.[2]

---

[1]  The two stipulations are:  the April 12, 2006 Stipulation Regarding Affirmative Defenses and the May 4, 2006 Stipulation Regarding Certain Post-September 18, 2005 Issues.

[2]  The other issues are (1) ordinary damages for infringement of the '042 patent from September 18, 2005, to the present, with September 18, 2005 being the date that defendant alleges it introduced a "new product"; and (2) damages for alleged willful infringement of the '042 patent from August 2, 2005, the date the Federal Circuit issued its decision in the case, to the present, addressing both the "old product" and the "new product."

Although, under the April 12, 2006 Stipulation, plaintiff agreed not to seek damages in this action for infringement by defendant's new product, plaintiff also asserted that the new product was not colorably different from the adjudicated-infringing product.  Thus, while a trial on the alleged willful

2 - OPINION & ORDER

1          The parties' April 12, 2006 Stipulation refers to another

2     patent infringement case brought by plaintiff against a different

3     defendant, and pending in this Court before Judge Brown:

4     CollegeNET, Inc. v. XAP Corp., No. CV-03-1229-BR (hereinafter "the

5     XAP case" or "Judge Brown's case").  The XAP case also concerns the

6     '278 and '042 patents.   In the April 12, 2006 Stipulation,

7     defendant agreed to dismiss its counterclaims and affirmative

8     defenses in the Amended Answer filed in the instant case, without

9     prejudice to defendant's right to reassert the affirmative defenses

10    and counterclaims in any new action in which plaintiff seeks

11    damages or other relief based on defendant's new product, or in the

12    event the XAP case settles without a final judgment. Apr. 12, 2006

13    Stip. at ¶ 2.  The parties also agreed to be "bound by a final non-

14    appealable judgment in the XAP case relating to the affirmative

15    defenses and counterclaims directed to the '042 patent (including

16    XAP's claims for invalidity and unenforceability of the '042

17    patent)."  Id. at ¶ 4.

18         As the parties were filing their pretrial documents in

19    September 2006, the XAP case was being tried before Judge Brown.

20    The jury in the XAP case returned its verdict on October 5, 2006.

21    The jury considered only eleven of the '042 patent's claims in the

22

23

24    infringement of the '042 patent from August 2, 2005, to September
      18, 2005 was contemplated, the precise issue for any damages
25    related to defendant's product after September 18, 2005, concerns
      the nature of the new product and its similarity to the old
26    product.  The April 12, 2006 Stipulation suggests the resolution
      of that issue may take place in the context of a request by
27    plaintiff for an injunction against the adjudicated-infringing
      product and products that are no more than colorably different
28    from that product.

3 - OPINION & ORDER

XAP case (claims 16, 18, 19, 20, 21, 22, 28, 32, 33, 36, and 38), and determined that those eleven claims were invalid for obviousness.

The litigation in the instant case was put on hold as the parties analyzed the effect of the verdict in the XAP case on the instant case. Initially, both parties requested that the October 30, 2006 trial be postponed. I granted that request. Eventually, plaintiff asked that the trial in the instant case be rescheduled at the Court's earliest convenience. Defendant objected, contending that an inequitable conduct defense asserted by XAP in the XAP case had not yet been tried, and also asserting that the XAP verdict had changed the landscape regarding the damages issues present in the instant case.

Defendant also argued that the April 12, 2006 Stipulation precluded plaintiff from litigating the infringement of the remaining claims of the '042 patent. Finally, defendant contended that the XAP jury's invalidity verdict on the eleven claims collaterally estopped plaintiff from maintaining its infringement assertions against defendant as to all other claims in the '042 patent.

Because the arguments regarding the April 12, 2006 Stipulation and collateral estoppel are potentially dispositive, I ordered the parties to brief those issues for my consideration. Thus, defendant presently moves for summary judgment on the collateral estoppel issue.[3] I grant the motion.

_____

[3] As a result of other post-XAP case verdict filings in the instant case, I concluded I had enough information and argument on the effect of the April 12, 2006 Stipulation. Accordingly, I

4 - OPINION & ORDER

1          SUMMARY JUDGMENT STANDARDS

2          Summary judgment is appropriate if there is no genuine issue

3     of material fact and the moving party is entitled to judgment as a

4     matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the

5     initial responsibility of informing the court of the basis of its

6     motion, and identifying those portions of "'pleadings, depositions,

7     answers to interrogatories, and admissions on file, together with

8     the affidavits, if any,' which it believes demonstrate the absence

9     of a genuine issue of material fact."  Celotex Corp. v. Catrett,

10    477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

11         "If the moving party meets its initial burden of showing 'the

12    absence of a material and triable issue of fact,' 'the burden then

13    moves to the opposing party, who must present significant probative

14    evidence tending to support its claim or defense.'"  Intel Corp. v.

15    Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)

16    (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th

17    Cir. 1987)).  The nonmoving party must go beyond the pleadings and

18    designate facts showing an issue for trial.  Celotex, 477 U.S. at

19    322-23.

20         The substantive law governing a claim determines whether a

21    fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors

22    Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as

23    to the existence of a genuine issue of fact must be resolved

24    against the moving party.  Matsushita Elec. Indus. Co. v. Zenith

25    Radio,  475 U.S. 574, 587 (1986).  The court should view inferences

26

27    specifically asked the parties for further briefing only on the
      collateral estoppel issue.  However, I consider and resolve both
28    arguments here.

5 - OPINION & ORDER

1  drawn from the facts in the light most favorable to the nonmoving

2  party.  T.W. Elec. Serv., 809 F.2d at 630-31.

3      If the factual context makes the nonmoving party's claim as to

4  the existence of a material issue of fact implausible, that party

5  must come forward with more persuasive evidence to support his

6  claim than would otherwise be necessary.  Id.; In re Agricultural

7  Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990);

8  California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,

9  Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

10                          DISCUSSION

11  I.  Legal Principles

12      The law of the regional circuit governs the application of

13  collateral estoppel in a patent infringement action.  Novartis

14  Pharms. Corp. v. Abbott Labs., 375 F.3d 1328, 1333 (Fed. Cir.

15  2004).  The doctrine of collateral estoppel, or "issue preclusion,"

16  "prevents relitigation of issues actually litigated and necessarily

17  decided, after a full and fair opportunity for litigation, in a

18  prior proceeding." Kourtis v. Cameron, 419 F.3d 989, 994 (9th Cir.

19  2005) (internal quotation omitted).

20      A federal court decision has preclusive effect where (1)
        the issue necessarily decided at the previous proceeding
21      is identical to the one which is sought to be
        relitigated; (2) the first proceeding ended with a final
22      judgment on the merits; and (3) the party against whom
        collateral estoppel is asserted was a party or in privity
23      with a party at the first proceeding.

24  Id.; see also Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1050

25  (9th Cir. 2008) (setting out standard in four elements:  (1) there

26  was a full and fair opportunity to litigate the issue in the

27  previous action; (2) the issue was actually litigated in that

28  action; (3) the issue was lost as a result of a final judgment in

6 - OPINION & ORDER

1  that action; and (4) the person against whom collateral estoppel is
2  asserted in the present action was a party or in privity with a
3  party in the previous action.).

4      "The burden is on the party seeking to rely upon issue
5  preclusion to prove each of the elements have been met." Kendall,
6  518 F.3d at 1050-51.

7      While general principles of collateral estoppel are governed
8  by the law of the regional circuit in patent cases, the more
9  exacting issue of the effect of a prior determination of invalidity
10 on current patent claims is one of patent law. E.g., Pharmacia &
11 Upjohn Co. v. Mylan Pharms., Inc., 170 F.3d 1373, 1381 & n.4 (Fed.
12 Cir. 1999).

13     As described by the Federal Circuit in a 2007 case, the
14 Supreme Court, in the seminal case of Blonder-Tongue Laboratories,
15 Inc. v. University of Illinois Foundation, 402 U.S. 313 (1971),
16 permitted the use of defensive collateral estoppel when the accused
17 infringer shows that (1) a patent was found invalid in a prior case
18 which had proceeded through final judgment and in which all
19 procedural opportunities were available to the patentee; (2) the
20 issues litigated were identical; and (3) the party against whom
21 estoppel is applied had a full and fair opportunity to litigate.
22 Abbott Labs. V. Andrx Pharms., Inc., 473 F.3d 1196, 1203 (Fed. Cir.
23 2007).

24     A.   Proceeded Through Final Judgment

25     Final judgment in the XAP case was filed on October 17, 2008.
26 This Judgment is final for purposes of applying collateral
27 estoppel, notwithstanding that plaintiff may file a motion for
28 judgment as a matter of law (JMOL) or an appeal.  "The law is well

7 - OPINION & ORDER

1  settled that the pendency of an appeal has no effect on the
2  finality or binding effect of a trial court's holding. . . . That
3  rule is applicable to holdings of patent invalidity as well."
4  Pharmacia, 170 F.3d. at 1381; see also Robi v. Five Platters, Inc.,
5  838 F.2d 318, 327 (9th Cir. 1988) (appeals did not affect
6  "firmness" of prior judgments for purposes of issue preclusion).

7  The same is true of JMOL or new trial motions. Pharmacia, 170
8  F.3d at 1381 (district court did not err in according the prior
9  judgment collateral estoppel effect despite the pendency of the
10 plaintiff's JMOL/new trial motion in that case); Tripati v. Henman,
11 857 F.2d 1366, 1367 (9th Cir. 1988) ("A pending Rule 59(e) motion
12 similarly does not deprive a judgment of finality for res judicata
13 purposes.").

14 B.  Litigation of Identical Issues

15 In Bourns, Inc. v. United States, the Court of Claims[4] made
16 clear that the defensive collateral estoppel recognized in Blonder-
17 Tongue extends to the unadjudicated claims in a patent to the
18 extent that those unadjudicated claims present issues identical to
19 the claims which were adjudicated and found invalid.  537 F.2d 486,
20 492 (Ct. Cl. 1976).  Collateral estoppel applies to patent claims
21 that were not previously adjudicated because the "issues litigated,
22 not the specific claims around which the issues were framed" are
23 determinative.  Westwood Chem., Inc. v. United States, 525 F.2d
24 1367, 1372 (Ct. Cl. 1975).

25

26      [4] The Court of Claims is the predecessor court of the
27 Federal Circuit, which has adopted as precedent the decisions of
    the Court of Claims.  Interconnect Planning Corp. v. Feil, 774
28 F.2d 1132, 1136 & n.2 (Fed. Cir. 1985).

8 - OPINION & ORDER

The Bourns court explained that

> if a patentee has [] been heard on all the factual issues necessary to an obviousness determination, and that determination already has been made adversely to one claim, neither due process nor any provision of the patent statute . . . require that the patentee be heard once again on those same issues and on the same obviousness determination simply because a different claim is involved.

Bourns, 537 F.2d at 492.

The Westwood court explained that "[w]here obviousness is the basis for the prior invalidity holding, an inquiry into the identity of the validity issue is more properly phrased in terms of the factual inquiries mandated by Graham v. John Deere Co., 338 U.S. 1, 17 [] (1966) as a prerequisite to such a validity determination." Westwood, 525 F.2d at 1375.

> Thus, the inquiry should be whether the nonlitigated claims present new issues as to the art pertinent to the nonlitigated claims; as to the scope and content of that art; as to the differences between the prior art and the nonlitigated claims; and as to the level of ordinary skill in that art. If none of these inquiries raises any new triable issues, then the obviousness determination in the prior proceeding should be equally applicable to the nonlitigated claims.

Id.

The court starts its analysis by comparing the adjudicated claims to the unadjudicated claims to determine if they are substantially identical. Id. ("the question [is] whether the issues of validity presented by [the] unadjudicated claims . . . are substantially identical to the issues of validity [in the adjudicated claims]"; "the most convenient way to approach a determination of these issues is . . . to compare the litigated and not litigated claims"); Medinol Ltd. v. Guidant Corp., 341 F. Supp. 2d 301, 315 (S.D. N.Y. 2004) (in analyzing whether prior

9 - OPINION & ORDER

obviousness invalidity determination should bind unadjudicated patent claims in subsequent litigation against different alleged infringer, "court . . . should first compare the adjudicated and unadjudicated claims"); see also Interconnect, 774 F.2d at 1136 (noting that Court of Claims in Westwood, when confronted with a situation where estoppel was raised as to unadjudicated claims of a patent whose other claims had been adjudicated in an earlier action, "adopted a pragmatic approach, stating that the first step was to determine whether any new issues were raised as to the nonlitigated claims.").

In making this comparison between the unadjudicated and adjudicated claims, "[i]f they are of identical scope, it readily follows that no new issues bearing on the obviousness determination are presented." Westwood, 525 F.2d at 1375; Medinol, 341 F. Supp. 2d at 315 ("If the scope of these claims is identical, then there are no new issues relating to an obviousness determination raised as to the nonlitigated claims.").

If the unadjudicated claims and the adjudicated claims are not identical, and the differences "are of a substantive nature," the court proceeds to the next step. Westwood, 525 F.2d at 1375 (if the comparison reveals "differences of a substantive nature . . . it will be necessary to go a step further . . . ."); Medinol, 341 F. Supp. 2d at 315 ("if this claim comparison reveals a substantive difference[,] 'it will be necessary to go a step further[.]'") (quoting Westwood, 525 F.2d at 1375). Thus, if the claims are not identical but the difference is minor and not substantive, collateral estoppel will apply because, as with identical claims, the unadjudicated claims raise no new issues relating to invalidity

based on obviousness.

With substantive differences, however, the court undertakes an examination of whether the nonlitigated claims "present new issues [1] as to the art pertinent to the nonlitigated claims; [2] as to the scope and content of that art; [3] as to the differences between the prior art and the nonlitigated claims; and [4] as to the level of ordinary skill in that art." Westwood, 525 F.2d at 1375.

The court must assess the differences between the prior art and the nonlitigated claims by examining the nonlitigated claims as part of the claimed combination as a whole and comparing the claimed combination as a whole to the prior art. As explained in Medinol:

> Although the "practicalities are to look to the distinguishing features incorporated into the claims and the validity determination necessarily focuses on those features," the "subject matter of the claim must be considered as a whole." . . . Indeed, Bourns teaches that where the nonmovant effectively argues that the additional elements distinguish the claimed combination as a whole from the prior art, it is not enough for a movant to show that those elements are disclosed in the prior art. . . . It is only where the claim comparison "indicates that the additional elements recited in the unadjudicated claims do not distinguish the claimed combination as a whole from the prior art," . . . that those newly asserted claims may not be litigated in a subsequent proceeding.

Medinol, 341 F. Supp. 2d at 315-16 (quoting Bourns, 537 F.2d at 493, 494) (citations and footnote omitted) (emphasis in Medinol). Additionally, the court must ensure that it compares a narrower unadjudicated claim to the prior art, not to a broader invalid claim. In Bourns, the plaintiff argued that the defendant's claim comparisons (in the context of the collateral estoppel argument),

> improperly treat[ed] the adjudicated claims as prior art,

11 - OPINION & ORDER

in an effort to show that the differences between the claims are obvious. Plaintiffs assert that each claim of a patent is entitled to a presumption of validity, that each claim is to be treated as a separate and complete invention, that the pertinent standard is as to the differences between the prior art and the claims, and that invalidity of a claim does not transform the subject matter of that claim into prior art.

Plaintiff's argument, so far as it goes, is clearly correct. A domino approach in which each successively narrower claim is compared with the one before it, not with the prior art, is inappropriate since it improperly gives prior-art effect to the subject matter of an invalid claim. . . . A claim may be invalid for obviousness under 24 U.S.C. § 103, but still describe a combination not found in the prior art. Moreover, it is well settled that each claim of a patent is entitled to a presumption of validity and is to be treated as a complete and independent invention . . . .

However, there is nothing in any of those long-accepted principles which appears to foreclose, or is inconsistent with, a determination that the issues bearing on validity of two separate claims are substantively the same. To assess the identity of those issues, it is convenient to compare the adjudicated and unadjudicated claims. Obviousness of the unadjudicated claims not being an issue, it is clear that the differences revealed by such comparisons must be evaluated, not in terms of obviousness under a domino approach, but, rather, in terms of the <u>Graham</u> issues. Where the differences revealed by a comparison of the claims do not vary the relevant issues bearing on obviousness, collateral estoppel should apply.

<u>Bourns</u>, 537 F.2d at 492-93 (citations omitted).

Thus, in assessing the differences, if any, between the prior art and the unadjudicated claims, the court must focus on the relationship between the prior art and the unadjudicated claims and not simply compare a narrower unadjudicated claim to an invalid broader claim. Also, the court must examine the prior art as to any distinguishing element in an unadjudicated claim not just as to that element alone, but as to the claimed combination as a whole.

C. Full and Fair Opportunity to Litigate

The "full and fair opportunity" inquiry is "quite narrow."

12 - OPINION & ORDER

1   Pharmacia, 170 F.3d at 1380 (further noting that the role of the

2   court in deciding collateral estoppel issue is not to review the

3   correctness of the prior jury verdict; whether the prior finding of

4   invalidity was correct is an inappropriate inquiry). Blonder-

5   Tongue "does not authorize unbridled excursions into the record of

6   the earlier trial before applying the estoppel of the previous

7   judgment." Kaiser Inds. Corp. v. Jones & Laughlin Steel Corp., 515

8   F.2d 964, 985 (3d Cir. 1975); see also Hughes Tool Co. v. Dresser

9   Indus., Inc., 209 U.S.P.Q. 652, 653 (N.D. Tex. 1980) ("the court

10  ruling on the plea of estoppel does not stand on the same role as

11  an appellate court").

12  II.  Preliminary Arguments by Plaintiff

13      A.  Standard of Proof

14      Plaintiff contends that defendant must prove invalidity by

15  clear and convincing evidence and that here, defendant improperly

16  relies on uncorroborated testimony of witnesses.

17      Plaintiff is mistaken. While in the first instance invalidity

18  must be proved by clear and convincing evidence, Sitrick v.

19  Dreamworks, LLC, 516 F.3d 993, 999 (Fed. Cir. 2008) ("evidentiary

20  burden to show facts supporting a conclusion of invalidity is one

21  of clear and convincing evidence because a patent is presumed

22  valid"), the issue presently before me is one of collateral

23  estoppel, not invalidity, and more specifically, whether there is

24  substantial identity between the adjudicated and unadjudicated

25  claims. Bourns, 537 F.2d at 493 n.6 (proponent of estoppel

26  argument has burden of establishing by a preponderance of the

27  evidence that identical issues are presented by the adjudicated and

28  unadjudicated claims).

13 - OPINION & ORDER

1    Also, while the case cited by plaintiff indicates that courts
2    have required "corroboration" of evidence in adjudications of
3    invalidity in the first instance, <u>Lacks Indus., Inc. v. McKechnie</u>
4    <u>Vehicle Components, USA, Inc.</u>, 322 F.3d 1355, 1350 (Fed. Cir. 2003)
5    ("courts have consistently required documentary corroboration of
6    oral testimony by interested parties presented to invalidate a
7    patent"), plaintiff cites no cases applying this requirement to
8    collateral estoppel issues, and I have found none.

9    B.  Judicial Estoppel

10    Plaintiff contends that defendant's motion for collateral
11    estoppel is inconsistent with two different positions defendant has
12    taken before this Court and thus, defendant is judicially estopped
13    from making the collateral estoppel argument.

14    First, plaintiff notes that after this case was remanded by
15    the Federal Circuit, defendant moved to have its invalidity
16    counterclaims and affirmative defenses reinstated.  In opposition
17    to that motion, plaintiff contended that as part of the jury's
18    rejection of defendant's invalidity arguments directed to the
19    <u>'278</u> patent, the jury necessarily decided certain issues of fact
20    that were relevant to the invalidity arguments directed to the '042
21    patent and thus, defendant could not proceed with such invalidity
22    arguments and the motion to reinstate those counterclaims and
23    affirmative defenses should be denied.

24    I rejected plaintiff's argument and held that issues
25    underlying the validity of the '042 patent were not actually
26    decided by the judgment issued on the '278 patent.  Nov. 8, 2005
27    Op. & Ord.  In my Opinion and Order, I explained that "[b]ecause
28    this record does not establish that the jury necessarily determined

14 - OPINION & ORDER

1    or even considered each of the disputed underlying factual issues

2    actually litigated as part of defendant's on-sale bar invalidity

3    counterclaim and defense as to the '278 patent, the doctrine of

4    issue preclusion/collateral estoppel does not prevent litigation of

5    those issues . . . against the '042 patent."  Nov. 8, 2005 Op. at

6    p. 28.  Plaintiff now argues that the holding in the November 8,

7    2005 Opinion is the law of the case and that defendant makes no

8    argument as to why this Court should depart from it.

9         Plaintiff, however, fails to acknowledge the prior discussion,

10   on the previous page of that Opinion, of the principle that a

11   jury's rejection of invalidity is not given preclusive effect.

12   Thus, there is no inconsistent position by defendant here when

13   earlier, defendant argued that no preclusive effect be given to a

14   determination of "not invalid," and now defendant argues that

15   preclusive effect should be given to a determination of invalidity.

16   As I previously stated:  "The jury's rejection of defendant's

17   invalidity argument distinguishes this case from a case where there

18   has been a determination of invalidity.  In that situation, all of

19   the elements establishing the invalidity defense must have been

20   actually decided because the party asserting the invalidity

21   argument could not otherwise prevail."  Nov. 8, 2005 Op. at p. 27-

22   28.

23        Next, plaintiff argues that defendant is estopped from

24   asserting that the presence of a "forms engine" or "forms

25   generator" in any unadjudicated claim does not raise any new

26   triable issues as to validity, when defendant has previously

27   suggested that its alleged elimination of a "forms engine" in its

28   "new product" (introduced September 18, 2005), raises significant

15 - OPINION & ORDER

1   issues as to infringement, requiring a separate resolution of

2   alleged infringement by defendant's new product.

3       In the instant motion, defendant argues that an unadjudicated

4   claim's additional element of a "forms engine," raises no

5   differences between the prior art and the unadjudicated claim that

6   were not addressed in the XAP case. I view this as a wholly

7   separate argument from the one defendant has previously suggested

8   it will make, when and if the issue of infringement by defendant's

9   new product is addressed. I do not see that defendant has taken

10  inconsistent positions when, on the one hand, defendant argues that

11  a forms engine is taught in the prior art and thus, unadjudicated

12  claims with that element are invalid via collateral estoppel, and

13  on the other hand, that the elimination of a forms engine from its

14  product, renders it an allegedly noninfringing new product.

15      C. Reexamination

16      Plaintiff suggests that the XAP case verdict is suspect

17  because of its inconsistency with the Patent and Trademark Office's

18  (PTO) later reaffirmation of the '042 patent. However, as

19  defendant notes, the Federal Circuit recognizes that a court and

20  the PTO are "two forums [that] take different approaches to

21  determining invalidity and on the same evidence could quite

22  correctly come to different conclusions." Ethicon, Inc. v. Quigg,

23  849 F.2d 1422, 1428 (Fed. Cir. 1988). Thus, there is no need to

24  consider the PTO's determination and it has no effect on the

25  validity of the Judgment in the XAP case.

26  III. The April 12, 2006 Stipulation

27      The April 12, 2006 Stipulation begins by identifying the

28  parties to the action and reciting that (1) plaintiff represents

16 - OPINION & ORDER

that its February 6, 2006 Supplemental Complaint in the case was not intended to assert a new claim for infringement against any product that is more than colorably different from the adjudicated-infringing systems of defendant; (2) defendant represents that it modified and implemented a new product on September 18, 2005, that is materially different with respect to the '042 patent from the adjudicated-infringing systems of defendant; and (3) plaintiff contends that the new product is not colorably different from the adjudicated-infringing product.

Based on these assertions, the parties then agreed on four points. They are:

1. CollegeNET will not seek in this Action any damages based on the New Product or any other relief expressly directed to the New Product. Nothing in this agreement, however, shall prevent CollegeNET from seeking and/or enforcing, after trial of the remaining issues (including, potentially, validity or enforceability under Paragraph 5), an injunction against the adjudicated-infringing product and products that are no more than colorably different therefrom.

2. ApplyYourself shall dismiss its counterclaims and affirmative defenses in its Amended Answer in this Action without prejudice to ApplyYourself's right to reassert these affirmative defenses and counterclaims: (1) in any new action in which CollegeNET seeks damages or other relief based on the ApplyYourself New Product; or (2) in the event that the XAP case settles without a final judgment, in which case all Parties' claims will be tried in this Action consistent with paragraph 5, below, and subject to the approval of the Court. Each Party by this Agreement preserves its position as to the proper scope of ApplyYourself's counterclaims and affirmative defenses.

3. Neither Party shall cite to the Court either this Agreement, or any action or inaction resulting from this Agreement, as a ground for changing the current Scheduling Order entered on February 17, 2006, in this Action. Trial in this Action is scheduled for October 30, 2006. By this Agreement, neither Party waives its right to seek a jury trial.

4. The Parties agree to be bound by a final non-

17 - OPINION & ORDER

appealable judgment in the XAP case relating to the affirmative defenses and counterclaims directed to the '042 patent (including XAP's claims for invalidity and unenforceability of the '042 patent).

Apr. 12, 2006 Stip. at ¶¶ 1-4, pages 1-2.

Next, three contingencies are recited. The first is if the XAP case settles before entry of a final judgment on XAP's affirmative defenses and counterclaims in the XAP case directed to the '042 patent, the parties agreed to void their agreement in the April 12, 2006 Stipulation, and to continue litigating this action. Id. at ¶ 5. Continuing in that paragraph, the parties recite that "[e]xcept as expressly provided in Paragraphs 1, 2, and 4 herein, nothing in this Agreement, or in the actions or inactions required thereby shall be cited by the Parties in this Action, or any other case, as a ground for barring CollegeNET or ApplyYourself from asserting a claim, counterclaim, or defenses." Id. at ¶ 5.

The second is if the XAP case settles after final judgment as to XAP's affirmative defenses and counterclaims in the XAP case directed to the '042 patent, but before any appeal has been taken by either XAP or CollegeNET, the parties in the instant case agree to a stipulated judgment in this case incorporating the final judgment and record, directed to the '042 patent, of the XAP case, whereby the losing party retains its right to appeal from such judgment based on such record. Id. at ¶ 6. If ApplyYourself's appeal or CollegeNET's appeal under paragraph 6 is dismissed without reaching the validity of the '042 patent, other than a party's voluntary dismissal, then paragraph 5 of the agreement controls, and the parties agree to void the agreement and to continue litigating. Id. Additionally, if the XAP case settles by

18 - OPINION & ORDER

a consent judgment that is a final non-appealable decision, then paragraph 5 of the agreement controls, and the parties agree to void the agreement and to continue litigating.  Id.

In paragraph 7, the third contingency, the parties recite that if XAP appeals an adverse decision relating to infringement, but not invalidity or unenforceability, the parties agree to a stipulated judgment in this action incorporating the final judgment and record, directed to the '042 patent, of the XAP case, where ApplyYourself retains its right to appeal from any portion of such judgment not appealed by XAP based on such record.  Id. at ¶ 7.  If ApplyYourself's appeal under paragraph 7 is dismissed without reaching the validity of the '042 patent, other than a party's voluntary dismissal, then paragraph 5 of the agreement controls, and the parties agree to void the agreement and to continue litigating.

Plaintiff contends that because defendant dismissed all of its affirmative defenses and counterclaims pursuant to the April 12, 2006 Stipulation, defendant cannot maintain an invalidity affirmative defense or counterclaim as to any of the unadjudicated claims, including the affirmative defense of collateral estoppel.

Defendant argues that because the parties agreed in the April 12, 2006 Stipulation to be bound by a final, nonappealable judgment in the XAP case, any claims adjudicated in that case are no longer at issue.  Defendant further notes that in a September 19, 2006 Joint Statement filed by the parties in the XAP case, plaintiff withdrew its allegations of infringement of seventeen claims of the '042 patent from that action.  Defendant contends that under the April 12, 2006 Stipulation, the invalidity defense on which XAP

19 - OPINION & ORDER

1  prevailed at the XAP trial, should apply to the claims plaintiff

2  withdrew in the XAP case, not just the claims that the jury

3  adjudicated.

4      I find no support in the April 12, 2006 Stipulation for either

5  party's position.   First, the fact that in the event of a

6  settlement of the XAP case, the parties agreed to resume litigation

7  in this case as if the April 12, 2006 Stipulation had never been

8  signed, undermines plaintiff's position here that affirmative

9  defenses and counterclaims were forever eliminated from this case.

10     Second, no part of the April 12, 2006 Stipulation answers the

11 question of what happens to claims and defenses in the XAP case

12 that were not tried for a reason other than settlement.   None of

13 the agreements or contingencies addresses the resolution of '042

14 patent claims not at issue in the XAP case and thus, not

15 adjudicated at trial, not dispensed with at summary judgment, or

16 not settled.

17     Third, in my reading of the April 12, 2006 Stipulation as a

18 whole, I understand the agreement to suggest that unless asserted

19 patent claims were resolved in the XAP case on summary judgment or

20 at trial, or in a settlement, the parties in the instant case may

21 still litigate the invalidity of any unadjudicated '042 patent

22 claims, or the infringement by the "new product" of the '042 patent

23 claims.   Thus, the infringement by the "new product" of the patent

24 claims, and the invalidity of the claims not adjudicated in the XAP

25 case, are still issues subject to litigation.

26 IV.  Collateral Estoppel of the Unadjudicated Claims

27     Of the three criteria for defensive collateral estoppel

28

20 - OPINION & ORDER

suggested by <u>Blonder-Tongue</u>,[5] only one needs extensive discussion here - the litigation of identical issues.  Plaintiff had the full and fair opportunity to litigate the validity of the '042 patent in the XAP case, and specifically, to litigate the question of invalidity based on obviousness.  Plaintiff (1) chose the time and place of litigation in the XAP case, (2) had ample "incentive to litigate," (3) was prepared to "litigate to the finish," (and indeed has), and (4) was not deprived of crucial evidence or witnesses in the XAP case litigation.  <u>See</u> <u>Blonder-Tongue</u>, 402 U.S. at 332-33 (noting factors to consider in analyzing "full and fair opportunity" to litigate).

Additionally, as noted above, the presence of a pending JMOL or new trial motion, or an appeal, does not affect the status of the Judgment in the XAP case as being final for the purposes of collateral estoppel.  Thus, there is no issue regarding the presence of a final judgment.

As to the "identical issues" element, as explained above, the relevant analysis examines the identity of issues between the unadjudicated claims and the adjudicated claims, with the court's inquiry directed to determining if there are any "new issues" regarding four factors:  the art pertinent to the unadjudicated claims, the scope and content of that art, the differences between that art and the unadjudicated claims, and the level of ordinary skill in the art.  Here, plaintiff does not dispute that there are

_____

    [5]  As noted above, they are (1) patent was found invalid in a prior case which proceeded through final judgment and all procedural opportunities were available to the patentee; (2) the issues litigated were identical; and (3) the party against whom estoppel is applied had a full and fair opportunity to litigate.

21 - OPINION & ORDER

1   no new issues as to the art pertinent to the unadjudicated claims

2   and the level of ordinary skill in the art.  See Pltf's Mem. at p.

3   6 (indicating that plaintiff disputes whether there are new issues

4   of validity only as to (1) the scope and content of the prior art

5   and (2) the differences between the prior art and the unadjudicated

6   claims).  Thus, where there is a substantive difference between an

7   unadjudicated and adjudicated claim, I do not address whether the

8   unadjudicated claims present new issues as to the art pertinent to

9   the unadjudicated claims or as to the level of ordinary skill in

10  the art.[6]

11      Defendant relies on the same prior art references that XAP

12  relied on in the XAP case.  Specifically, defendant relies on (1)

13  CollegeNET's ApplyWeb 1; (2) the CollegeEdge system; (3) the XAP

14  Disk System; (4) the XAP Legacy System; and (5) the CollegeEdge

15  system and both XAP systems in combination with the CyberCash

16  system.  Deft's Mem. at p. 18.  In addition, in explaining the

17  specific teachings of these prior art references, defendant relies

18  only on the XAP trial transcripts and exhibits.  Id.

19      Plaintiff notes that in its memorandum in support of its

20  collateral estoppel motion, defendant fails to identify, in the

21  list of prior art from the XAP case that defendant relies on here,

22  certain combinations of prior art that the XAP jury was instructed

23

24      [6]  In the XAP case, CollegeNET's expert testified that one
    of ordinary skill in the art is "somebody who had gotten an
25  undergraduate degree in computer science or similar discipline,
    or had . . . equivalent amount of experience; plus a year working
26  in the industry after the degree."  Deft's Exh. 3A at p. 604.
    Defendant states that for the purposes of this motion, it adopts
27  this definition.

28

to consider.  Judge Brown instructed the jury in the XAP case that XAP contended the asserted claims of the '042 patent were rendered obvious by several recited pieces of prior art, all of which defendant here expressly states it relies on.  Pltf's Exh. 2 at p. 19.  Judge Brown then further instructed the jury that

> XAP contends that the combination of two or more printed publications concerning the XAP Legacy Online System [[Trial Exhibits] 1112, 1134, 1136, and 1137] render obvious both the '278 and '042 patents and that two printed publications concerning the CollegeEdge Online System [[Trial Exhibit] 1360 and 1353] in combination render obvious the claims of the '042 patent.  A reference is a "printed publication" if it existed before the date of conception and is accessible to those interested in the field, even [if] it is difficult to find.

Id.

Plaintiff suggests that because defendant does not expressly state that it relies on these additional printed publications in support of its collateral estoppel motion, it cannot prevail here. Plaintiff explains that because the XAP case jury did not specify which pieces of prior art invalidated a particular claim or claim element, to invalidate an unadjudicated claim on the basis of collateral estoppel would be inappropriate because of the risk that the jury may have invalidated a claim based on prior art not asserted in this motion.

I reject this argument for three reasons.  First, I do not read defendant's memorandum as limiting the prior art on which it now relies to less than all of the prior art references given to the jury in the XAP case.  In its memorandum, defendant states as follows:

> ApplyYourself relies on the same prior art references relied on by XAP-CollegeNET's ApplyWeb I, the CollegeEdge system, the XAP Disk System, the XAP Legacy System, as

23 - OPINION & ORDER

well as the CollegeEdge system and both XAP systems in
combination with the CyberCash system. (Ex. 3B at 1899).

Deft's Mem. at p. 18. The cited page is a copy of the XAP case
trial transcript in which Judge Brown orally instructed the jury as
to the prior art references. She first listed the same references
as defendant expressly recites in its memorandum, and then further
instructed the jury regarding the printed publications, as quoted
previously, above. Deft's Exh. 3B at p. 1899. The oral
instruction is the same as the printed instruction found at page 19
of Plaintiff's Exhibit 2. By citing to this exhibit in support of
its statement that defendant relies on the same prior art
references relied on in the XAP trial, defendant here has made
clear that it relies on all the prior art references presented to
the jury in the XAP case, not just some of them. See also Deft's
Mem. at p. 15 (quoting the oral recitation by Judge Brown of the
full jury instruction on the prior art).

Second, my review of the exhibit list in the XAP case supports
defendant's assertion at oral argument in the collateral estoppel
motion that the publication references simply corroborate the
public use of the systems already delineated by Judge Brown in her
jury instructions and expressly relied on by defendant here.

Third, the fact that defendant failed to expressly list these
combinations of prior art references in its memorandum is
immaterial. The relevant issue is whether any additional elements
present in the unadjudicated claims distinguish the claimed
combination as a whole from the prior art. The only prior art
considered in this motion is what was admitted into evidence in the
XAP case. These combinations of printed publications are not new

24 - OPINION & ORDER

1  prior art, unconsidered by the XAP jury.  It makes no difference
2  that defendant did not actually recite these combinations of
3  printed publications in its memorandum, especially when defendant
4  does say that it relies on the prior art in the XAP case.  That is
5  sufficient.

6      Additionally, plaintiff contends that without a verdict in the
7  XAP trial which reveals what pieces of prior art or prior art
8  combinations the jury relied on to invalidate particular claims and
9  elements, the Court cannot apply collateral estoppel.  In support,
10  plaintiff relies on cases generally addressing the "necessarily
11  decided" element of a collateral estoppel analysis, not cases
12  applying collateral estoppel principles in the particular context
13  of a jury's finding a patent claim invalid based on obviousness.

14      As noted above, the application of collateral estoppel
15  requires that the issue sought to be collaterally estopped was
16  necessarily determined in the prior litigation.  Thus, when the
17  court which is asked to apply collateral estoppel cannot ascertain
18  whether the issue was so determined in the prior litigation,
19  collateral estoppel is inappropriate.  E.g., Novartis Pharms. Corp.
20  v. Abbott Labs., 375 F.3d 1328, 1334 (Fed. Cir. 2004) (because
21  court could not determine from jury's verdict or trial record that
22  the district court's claim construction was necessary to the jury's
23  noninfringement decision on the patent, the defendant had not met
24  its burden to show that the claim construction of that term by the
25  district court was necessary to the jury's noninfringement decision
26  and collateral estoppel not applied).

27      Plaintiff argues that the record from the XAP trial fails to
28  reveal certain determinations such as whether each system and

25 - OPINION & ORDER

publication were determined to be prior art under 35 U.S.C. § 102, and whether the prior art disclosed a motive to combine elements into the inventions claimed in the unadjudicated claims of the '042 patent.

Plaintiff contends that the prior art references relied on by XAP, and thus relied on by defendant here, are not in fact prior art references. Plaintiff states that which alleged features of the various systems qualify as prior art for the purposes of an obviousness analysis was contested at the XAP trial and thus, there are factual issues as to the scope and content of the prior art precluding the application of collateral estoppel. Plaintiff suggests that because the jury verdict and the trial record do not reveal which prior art references the jury relied on and the consideration of the references as prior art was contested at the XAP trial, this Court cannot conclude that the issue was necessarily determined in the XAP case.

I disagree. The Judgment in the XAP case precludes consideration of these arguments. As noted above, a collateral estoppel motion does not allow plaintiff here to reargue the merits of the prior invalidity verdict. Plaintiff's argument is nothing more than a rehash of issues decided in the XAP case. That is, while plaintiff may still dispute whether some of the prior art references were in fact prior art, the jury, by concluding that eleven claims of the '042 patent were invalid as obvious, necessarily determined that the particular prior art reference or combination of prior art reference, that taught the elements of the adjudicated invalid claims, were, in fact, prior art. This is not, for example, a case where the jury determined that the patent was

26 - OPINION & ORDER

1  invalid, but did not articulate on what basis (<u>e.g.</u>, on-sale bar,
2  anticipation, obviousness, etc.). Thus, plaintiff's argument has
3  no merit as to the elements of unadjudicated claims that are
4  substantially identical to elements of adjudicated invalid claims
5  because the XAP jury necessarily determined that the prior art
6  which invalidated the claims before it, was "prior art."

7      As to additional elements in the unadjudicated claims,
8  plaintiff's argument is that if the jury was presented with prior
9  art references 1 through 7, and invalidated the claims before it as
10 obvious based on, hypothetically, references 1 through 5, then the
11 jury necessarily determined only that references 1 through 5 were
12 in fact, prior art, and that there was a motive to combine
13 references 1 through 5. Thus, the argument continues, if the
14 additional element in an unadjudicated claim is recited in prior
15 art references 6 and/or 7, the jury has not necessarily made a
16 determination about those particular prior art references.

17     <u>Medinol</u>, however, explains that in the unique context of a
18 <u>Blonder-Tongue</u> and progeny collateral estoppel analysis,
19 plaintiff's argument is not well-taken. In <u>Medinol</u>, the plaintiff
20 argued that not all of the relevant issues were necessarily decided
21 in prior litigation. 341 F. Supp. 2d at 318. The plaintiff
22 contended that the defendant could not "point to any element of the
23 jury's obviousness determinations that necessitated a finding that
24 <u>all</u> the prior art cited by [the defendant in the prior litigation]
25 teaches what [that defendant] argued it taught and that there was
26 a general motivation to combine <u>all</u> of that art." <u>Id.</u>

27     The <u>Medinol</u> court rejected this argument for two reasons.
28 First, it noted, non-patent collateral estoppel cases were

27 - OPINION & ORDER

distinguishable.    The court explained that the defendant sought collateral estoppel with respect to the jury's "<u>finding of obviousness</u>" regarding certain claims.    <u>Id.</u>    The court stated:

> It is undisputed that the jury found that every element of those claims is disclosed in the prior art and that motivation existed for a person of ordinary skill in the art to combine the limitations disclosed in these claims. . . . Because it is the finding of obviousness over the prior art that forms the basis of this collateral estoppel motion, the (non-patent) cases upon which [the defendant] relies, . . . are distinguishable.

<u>Id.</u> at 318-19 (citations and footnotes omitted).

Second, the court explained that "although in general there is no different law of collateral estoppel for patent cases, patent cases undoubtedly raise unique concerns."    <u>Id.</u> at 319 (internal quotation omitted).    The court noted that "[i]f estoppel is denied because multiple prior art references support the jury's finding of invalidity for obviousness, the implication will be that a jury verdict could <u>only</u> be accorded preclusive effect if the verdict rests on a single prior art reference."    <u>Id.</u> at 320.    The court concluded that this was contrary to the Supreme Court's concern, expressed in <u>Blonder-Tongue</u>, of costly relitigation of patent issues.    <u>Id.</u>    It stated, "this theory would require a full-blown obviousness analysis of every claim element, forcing a wasteful relitigation of every facet of obviousness regarding an invention that has already had its day in court."    <u>Id.</u>    It further rejected the theory as not being required by the test articulated in <u>Westwood</u>, <u>Bourns</u>, and <u>Interconnect</u>.    <u>Id.</u>

I agree with the <u>Medinol</u> court's analysis.    If plaintiff's argument prevailed, collateral estoppel would never be available to a defendant in a subsequent case when multiple prior art references

28 - OPINION & ORDER

were relied upon in a prior proceeding.  It is unrealistic to expect a jury verdict to reveal exactly what pieces of the prior art, or combinations of the prior art, the jury relied on to invalidate particular elements of claims.  The issue to be accorded preclusive effect is the XAP jury's determination of obviousness, for which the relevant question is whether the unadjudicated claims raise any new issues as to the prior art that was before the jury in the XAP case.

A.  The Claims

The '042 patent has 44 claims.  Four claims are independent: Claims 1, 16, 32, and 38.  In the XAP case, Claims 16, 18-22, 28, 32, 33, 36, and 38, were presented to the jury and all were found invalid for obviousness.  Thus, the unadjudicated claims are 1-15, 17, 23-27, 29-31, 34, 35, 37, and 39-44.

At oral argument, plaintiff's counsel stated that certain slides prepared for display at oral argument suggested which of the unadjudicated claims plaintiff contends have distinctive elements. Transcript of Oral Arg. at p. 8 (dkt #693).  Plaintiff's counsel indicated that if the Court did not see the claim itemized in plaintiff's slides five through nine, then plaintiff was not contesting collateral estoppel as to that claim.  Id.  Plaintiff's counsel further indicated, however, that he wanted the opportunity to confirm the information in the slides.  Id.  Following oral argument, the Court has received no express confirmation from plaintiff.  I take this to mean that plaintiff has no new arguments to present, other than what is in the slides, and that the Court may properly rely on plaintiff's counsel's statements that if a claim is not noted in slides five through nine, plaintiff does not

29 - OPINION & ORDER

challenge the application of collateral estoppel to that claim.

My review of the slides indicates that plaintiff does not contest that it is collaterally estopped from challenging the invalidity of Claims 17, 23, 30, 31, 35, 39, 43, and 44. Nonetheless, out of an abundance of caution, I discuss all of the unadjudicated claims.

B.  <u>Independent Claim 1</u>

Claim 1 is similar to invalid independent Claim 16.  Claim 1 states as follows, with underlined portions also found in Claim 16 and bracketed portions found only in Claim 16, but not in Claim 1:

> <u>A method of processing over a computer network forms directed by multiple public forms users to multiple institutions</u> of higher education, <u>the forms being processed by a third party forms servicer that is neither one of the</u> [multiple] <u>institutions</u> of higher education <u>nor one of the public forms users, the method comprising</u>:

> <u>presenting to a form user over a computer network by a third party forms servicer</u> in response to a request from the form user, <u>a form directed to one of the multiple institutions</u> of higher education, the form being generated by a forms generator that generates multiple forms corresponding to multiple institutions of higher education, the forms generator generating forms that are customized in appearance and content in accordance with the preference of the institution to which each of the forms is directed and that include an indication of source corresponding to the institution to which each of the forms is directed so as to provide to the users of the forms the appearance that the forms are associated with the specific institutions to which they are directed, <u>the forms including fields for the forms user</u>s <u>to enter user information</u>;

> entering user information onto the form;

> entering payment information;

> <u>receiving by the third party forms servicer over the computer network user information and electronic payment information entered by the user</u>;

> <u>processing by the third party forms servicer an</u>

30 - OPINION & ORDER

electronic payment associated with the form, the
processed payment being from the user to the one of
the multiple institutions to which the form is
directed;

processing [providing] by the third party forms
servicer the user information in accordance with
the preferences of [to] the institution of higher
education to which the form is directed to make the
user information available to the institution in a
format specified by the institution, the third
party forms servicer thereby providing to public
users customized forms identified with
institution[s] of higher education and providing to
the institutions custom-formatted data, while
relieving the institution of the administrative
burden of processing forms and payments.

Deft's Exh. 1B ('042 patent at 35:1-44; 36:32-57) (hereinafter

referred to only by column and line number).

1.   Additional Elements Creating No Substantive Change

The differences in language as to "multiple institutions of

higher education," and "multiple institutions," or as to "neither

one of the institutions of higher education," or "neither one of

the multiple institutions," are insubstantial.   No further

discussion of these differences is required.

The addition of the phrase "in response to a request from a

form user," is also insubstantial because while this phrase is not

expressly recited in invalid Claim 16, the introductory paragraph

of invalid Claim 16, seen also in Claim 1, reveals that the forms

being processed by the third party forms servicer are forms

directed by multiple public form users to multiple institutions and

thus, the language in Claim 1 that the third party forms servicer's

presentation of a form to a form user is in response to a request

form a form user, is not a substantive addition to what is recited

in invalid Claim 16.   That is, this additional phrase in Claim 1

simply makes express what is already impliedly disclosed in invalid

31 - OPINION & ORDER

Claim 16 - the form user is provided a form by the third party forms servicer in response to the form user's request because the process disclosed is one where the form user is directing the form to the institution and thus, the form user initiates the process. Additionally, the phrase raises no new issues because it recites a narrower function than what is recited in invalid Claim 16 which is broader in that invalid Claim 16 has no limit or delineation of who has made a request for the presentation of the form, but more generally discloses the function of presenting.

Next, Claim 1 recites two functions not expressly recited in invalid Claim 16:  entering user information onto the form, and entering payment information.  These two additional elements are not substantively different from the function disclosed by invalid Claim 16.  Invalid Claim 16 recites, as does Claim 1, "receiving by the third party forms servicer over the computer network user information and electronic payment information <u>entered by the user</u>." 36:42-44 (emphasis added).  The fact that Claim 1 extracts part of this element and restates it separately, preceding the function of receipt of the information by the forms servicer, does not make these elements a substantive addition because invalid Claim 16 already discloses that user information and payment information are entered by the user.

2.    Additional Elements Substantively Different

The second full paragraph of Claim 1 contains a limitation not recited in invalid Claim 16.  This limitation discloses that the form presented to the form user by the third party forms servicer is generated by a forms generator which can (1) generate multiple forms which are (2) customized in appearance and content in

32 - OPINION & ORDER

1  accordance with the preference of the institution to which the form
2  user will direct the form, and which (3) include an indication of
3  source corresponding to the institution to which each of the forms
4  is directed so that the form appears to the form user to be
5  associated with the institution to which the form user is directing
6  the form.

7       This limitation introduces three different functions - the
8  generation of multiple forms, customizing them according to the
9  institution's preferences, and indicating a source so the form
10 appears to be associated with the institution.  Defendant contends
11 that each of these three additional functions is present in the
12 prior art and the combination of prior art.

13                  a.  Generation of Multiple Forms

14      Defendant contends that the ApplyWeb I prior art reference
15 discloses this function.  Defense witness Barbara Frederiksen
16 testified at the XAP trial that "the form that was prepared by the
17 ApplyWeb system will be presented to the user over the network,
18 that could be any one [of a number] of forms for multiple different
19 institutions." Deft's Exh. 3B[7] at p. 1535.  Additionally, ApplyWeb
20 I provided applications to multiple institutions of higher
21 education, including California State University at Chico and the
22 University of Wisconsin.  Id. at pp. 1515-16.

23      Frederiksen testified that "[t]his [referring to Exhibit 376]
24 is the second application.  This is for California State University
25 at Chico.  And again, this is an application that will be generated

26

27       [7]  Defendant's exhibits are appended to the February 29,
28 2008 Affidavit of Kathleen Bricken, submitted in support of
   defendant's summary judgment motion on collateral estoppel.

33 - OPINION & ORDER

by the ApplyWeb system." Id. at p. 1515. Frederiksen then testified that the "form for Chico include[s] fields that were not in the University of Wisconsin form?" Id. at p. 1516.

b. Customization & Indication of Source

Plaintiff's witness Michael Hitchcock explained that in the ApplyWeb I system, "there [was] one of those .in files for each form for each school . . . [;] [the .in files] were used to [customize] the form[; and] they would cause the different questions that the school wanted on that form to show up as HTML form controls." Deft's Exh. 3A at p. 578.

Frederiksen testified that the

> .in files . . . specify both the selection of fields that will be present on the form [and] the order of those fields. They specify information about how the form will be branded for the university, such as the name of the university, the title of the form, the logo of the university. They provide the university-specific fee. On the examples we saw, that we just looked at, they were different fees for the different universities.

Deft's Exh. 3B at pp. 1522-23. Frederiksen also testified that, in ApplyWeb I, "the institution determines what its application should look like. And again, that determination is both used for the collection of data and the subsequent presentation of the data back to the institution." Id. at p. 1543.

Dr. Justin Tygar testified that the XAP Legacy System supported multiple institutions and had "custom forms for different institutions." Id. at pp. 1632-33. The XAP Legacy System presented information specific to the institution. Id. at p. 1632.

I agree with defendant that the prior art teaches the functions expressed in this part of Claim 1. Both ApplyWeb I and the XAP Legacy System serviced multiple institutions. They also

34 - OPINION & ORDER

provided forms customized, designed, and formatted for each institution.  The prior art discloses the ability to brand forms for each institution, including the name and logo of the institution, and the title of the form.

The next substantive difference appears in the last full paragraph of Claim 1.  Although it is similar to the last full paragraph of invalid Claim 16, it begins with the word "processing" instead of "providing," and discloses that the third party forms servicer processed user information "in accordance with the preferences of the institution" in order "to make the user information available to the institution[.]"  35:34-38.  The function disclosed by this additional language is making the user information available to the institution by processing the user information, or providing the user information to the institution, in accordance with the institution's preferences.

I agree with defendant that this function is disclosed in the prior art.  Dr. Tygar testified that the CollegeEDGE system was "able to supply data in a format selected by an institution." Deft's Exh. 3B at p. 1645.  Dr. Tygar also testified that the XAP Legacy System was able to provide data in more than one format, that it had custom forms for different institutions, and it would format the data in the format required by the institution.  Id. at pp. 1630, 1633.

Frank Tansey also testified that the XAP system had "multiple formats . . . probably four different formats . . . [a]nd so a school could just indicate what format they wanted to receive it, and when they downloaded their information, it would come in that format."  Id. at pp. 1346-47.

35 - OPINION & ORDER

1    Finally, two witnesses indicated that ApplyWeb I provided
2    applicant data to the intended institution as desired by the
3    institution. Id. at p. 1427 (witness Jon Batcheller noted that
4    under ApplyWeb I, the system would provide different groupings of
5    information in its transmission of data to a school, to match the
6    information on each school's application); 1541 (Frederiksen
7    testified that ApplyWeb I prepared information for transmission to
8    the university in the order "specified in the university's .in
9    file[,]" allowing "each institution [to] see[] things in a tailored
10   view that they've specified via the .in file.").

11   In comparing Claim 1 to invalid Claim 16, all of the recited
12   elements in Claim 1 are either identical to elements found in
13   invalid Claim 16, are not substantively different from those found
14   in invalid Claim 16, or are disclosed in the same prior art
15   considered by the XAP jury. Nonetheless, as the cases make clear,
16   Claim 1 is not rendered invalid by collateral estoppel simply
17   because the additional, substantively different elements are all
18   found in the prior art. Rather, the court must determine whether
19   the additional element(s), when viewed in combination with the rest
20   of the claim, raises any new factual issues, reserved for the
21   factfinder, as to whether the claimed combination as a whole is
22   distinguishable from the prior art. I agree with defendant that
23   when viewed in combination, the presence of the additional,
24   substantively different elements, raises no new factual issues
25   regarding Claim 1.

26   Plaintiff contends that Claim 1's claimed combination as a
27   whole reveals two notable distinctions over invalid Claim 16.
28   First, as to the second full paragraph of Claim 1 and its
36 - OPINION & ORDER

recitation of a forms generator generating multiple, customized forms which indicate a source, plaintiff argues that this element provides a function which facilitates the efficient rendering of multiple customized forms without requiring complicated programming.

Plaintiff cites to testimony from an unidentified witness in the XAP case who explained that the "forms generator would . . . understand what was required [of the application description of a particular institution and] . . . would go look in the applicant database to see . . do we have any information on in [sic] applicant yet?" Exh. 1 to Monkress Declr. at p. 608.[8]  The witness then stated that the forms engine interprets the application description information for a particular institution "in order to create a form." Id. at pp. 609-10.

Plaintiff contends that this additional element, when viewed in combination with Claim 1's other elements, benefits institutions and users by reducing burdens associated with the application process, and also reduces the burden on the forms servicer to create and maintain customized forms for each institution.

The problem is that this is not a distinct function.  First, invalid Claim 16 expressly mentions relieving the institution of the burden of processing forms.

Second, the reduction of a burden on the user is inherent in the function.  That is, the ease of filling out an electronic form, thereby eliminating the need for a paper application, is the

---

[8]  Page 492 of this exhibit suggests the witness was David Maier.

37 - OPINION & ORDER

principal benefit to the user.  To the extent plaintiff contends that the burden on the user is eased because when the user completes a second form, the forms generator is able to "look in the applicant database," and insert user information into the second form, that is not a function disclosed in Claim 1.

Additionally, nothing in Claim 1 indicates that its function is to ease a burden on the forms servicer.  Plaintiff fails to explain how Claim 1 accomplishes such a function.  The third party forms servicer is defined as "the business entity hosting the forms engine software."  Exh. 3 to Monkress Declr. at p. 3.  "Forms generator" and "forms engine program" were both defined as "a software program, which, with or without additional software programs, creates or generates multiple forms corresponding to multiple institutions."  Oct. 29, 2004 Findings & Rec. at p. 36 (adopted by Judge Brown May 13, 2005).  The presence of a forms generator in this element of Claim 1, defined as a software program which creates or generates multiple forms, does not disclose a function separate from any function seen in invalid Claim 16.  If Claim 1 does not disclose the function at all, or merely discloses the same function as disclosed in invalid Claim 16, it cannot raise new issues regarding the prior art.

Plaintiff also notes that the "indication of source" portion of this particular claim element, when considered in combination with the other elements in Claim 1, makes the claim distinguishable from the prior art because the claimed combination benefits institutions by facilitating the use of an independent forms servicer to provide and host application forms without sacrificing the brand identity for the institution.  But, invalid Claim 16

already recites that function by expressly stating that the third party forms servicer provides the information to the institution in a format specified by the institution, provides a customized form identified with the institution to the user, and provides custom-formatted data to the institution.  Thus, the additional element, even considered in combination with other elements of the claim, presents no new issues as to the prior art, or as to a motive to combine the prior art.

There is no substantive distinction between Claim 1 and invalid Claim 16 creating new factual issues regarding the prior art.  The XAP jury, to invalidate Claim 16, had the same prior art references before it and necessarily found that the prior art recited the functions in invalid Claim 16 either directly or in combination.  Because, even when viewed in combination, no significant differences or functions emerge, collateral estoppel invalidates Claim 1.

C.  Dependent Claims 2 and 17[9]

Claim 2 states:  "The method of claim **1** in which entering the payment information includes entering payment information onto the form."  35: 45-47.  Claim 17 states:  "The method of claim **16** in which entering payment information includes entering payment information onto the form."  36:58-60.

"Entering payment information onto the form," is defined as "entering the payment information in some designated data field(s) of the form generated by the forms engine program and customized in

_____

[9] As noted earlier, Claim 17 is one of the claims to which plaintiff does not challenge the application of collateral estoppel.

39 - OPINION & ORDER

its appearance and content in accordance with the preferences of the institution." Oct. 29, 2004 Findings & Rec. at p. 25. Defendant contends that the function is taught by the prior art.

Frederiksen testified that forms generated by ApplyWeb I "collected payment information." Deft's Exh. 3B at p. 1548; see also Id. at p. 1535 (Frederiksen testified that forms generated by ApplyWeb I "had at least two pages to the form, the initial page in which the user would enter data, and a second page in which they would enter payment information so that the application could be processed by the institution."). Frederiksen also testified that ApplyWeb I had a validation system which caused "the payment authorization to be validated so that the user could know that they had entered a valid card number and a valid date." Id. at p. 1549.

I agree with defendant that the function recited in Claims 2 and 17 is in the prior art. Even when Claim 2 is considered in combination with Claim 1, from which Claim 2 depends, and even when Claim 17 is considered in combination with invalid Claim 16, from which Claim 17 depends, the additional element regarding entering payment information onto the form in these unadjudicated claims does not distinguish the claim combination as a whole from the prior art. The prior art considered by the XAP jury also recites the function disclosed in Claims 2 and 17. The XAP jury necessarily combined the relevant prior art references to invalidate Claim 16. Because the function of entering payment information is disclosed in Claim 16 ("electronic payment information entered by the user"), there are no new issues regarding the prior art or the motive to combine it in regard to Claims 2 and 17.

40 - OPINION & ORDER

D. Dependent Claims 3-6, and 12

Claims 3-6 and 12 are similar to invalid Claims 18-22 and 28. Recited here are Claims 3-6 and 12, with underlined portions identifying the identical language from the parallel invalid claim, and brackets identifying language appearing only in the invalid claim.

3. The method of claim **1** [**16**] further comprising storing by the third party the user information entered onto the form.

4. The method of claim **3** [**18**] further comprising:

presenting over a computer network by a third party forms servicer in response to a request from the form user, a second form directed to one of the multiple institutions of higher education; and

automatically inserting into the second form user information previously entered onto a form by the form user.

5. The method of claim **1** [**16**] in which receiving by the third party forms servicer over the computer network user information and electronic payment information entered by the user includes verifying that the user information satisfies criteria specified by the one of the multiple institutions of higher education to which the form is directed.

6. The method of claim **1** [**16**] in which presenting to a form [to a form] user over a computer network by a third party forms servicer in response to a request from the form user, a form directed to one of the multiple institutions of higher education, includes presenting a form including multiple pages.

12. The method of claim **1** [**16**] further comprising verifying in accordance with validation criteria the user information on a completed form when the completed form is submitted.

36:61-67 - 37:3-11; 37:34-36.

Claims 3, 4, 5, and 12 are identical to invalid Claims 18, 19, 20, and 28, with the exception of the words "of higher education" in Claim 4 which do not appear in parallel invalid Claim 19. As

noted above, the presence of these additional words is insignificant. Given that these claims are identical to invalidated claims, these additional elements present no new issues as to the prior art. This is true even when these claims are considered in combination with the independent claim from which they depend (or in the case of Claim 4, when considered in combination with both dependent Claim 3, from which Claim 4 depends, and Claim 1, from which Claim 3 depends).

Claim 6 contains two phrases which do not appear in invalid Claim 21: (1) "by a third party forms servicer in response to a request from the form user"; and (2) "a form directed to one of the multiple institutions of higher education."

Defendant contends that these additional phrases in Claim 6 add nothing of distinction because they merely repeat language already recited in invalid Claim 16. The relevant passage from invalid Claim 16 reads:

> presenting to a form user over a computer network by a third party forms servicer a form directed to one of the multiple institutions, the forms including fields for the forms user to enter user information.

36:37-40.

Defendant contends that because the elements of Claim 6 are present in nearly identical invalid Claim 28, or are present in some part of invalid Claim 16, Claim 6 is invalid because the jury necessarily determined that the prior art discloses all elements of the invalid claims, and thus, the prior art must disclose all elements of the identically-worded, or nearly identically-worded, unadjudicated claim.

I agree with defendant. First, I note that the one phrase in

42 - OPINION & ORDER

Claim 6 that is not recited in invalid Claim 28 or in the relevant portion of invalid Claim 16 quoted immediately above, is the phrase "in response to a request from the form user." However, as explained above in the discussion of Claim 1, this is an insubstantial addition. Second, the limitation that Claim 6 adds to Claim 1, from which Claim 6 depends, is that the form being presented to the form user by the third party forms servicer which is then directed to an institution, includes a multiple-page form. But, this limitation is expressly recited in invalid Claim 21. Thus, the jury must have concluded that the prior art taught that particular limitation. Accordingly, the additional element presented in Claim 6 raises no new prior art issues. This is true even when Claim 6 is considered in combination with Claim 1. The additional element in unadjudicated Claim 6, when considered in combination with Claim 1, does not distinguish the claimed combination from the prior art.

E.    Dependent Claims 39 and 43[10]:  Receiving User Information

Claims 39 and 43 both depend from invalid Claim 38. Claim 39 states:

> The method of claim **38** in which receiving by an institution from a third party forms servicer user information in a format specified by the institution includes receiving by an institution of higher education from a third party forms servicer user information derived from a customized admissions application form branded to the institution.

38:62-67.

Claim 43 states:

_____

[10] As noted above, Claims 39 and 43 are claims to which plaintiff does not challenge the application of collateral estoppel.

43 - OPINION & ORDER

The method of claim **38** in which receiving by an institution from a third party forms servicer user information in a format specified by the institution includes receiving by an institution from a third party forms servicer user information in a format specified by the institution, the information being derived from a multiple page form directed to the institution by a form user.

40:10-16.

Defendant argues, and I agree, that Claims 39 and 43 recite similar functions: receipt by the institution of user information in a format specified by the institution, the user information being derived from a custom, multiple-page application form branded to the institution, the form having been directed to the institution by the form user. These concepts, however, are not distinctive and do not present new issues as to the prior art.

As discussed above, the patented system's function of generating a form customized to the institution and branded by the institution, is already recited in parts of Claim 1 and invalid Claim 16. The discussion of Claim 1 further shows that these functions are recited in the prior art.

Other prior art evidence reinforces this conclusion and shows that the concept of multi-page applications was known in the prior art. The CollegeEDGE system allowed institutions, such as Boston College and the Massachusetts Institute of Technology (MIT), to customize their multi-page application forms. Deft's Exh. 7 at p. 1 (copy of XAP's Exh. 1360 showing information provided by CollegeEDGE indicating that its program provided "exact replica printing . . . [to] allow students to create paper applications that look exactly like the paper version using a browser . . ."); Id. at pp. 2-3 (pages of CollegeEDGE's application forms for Boston

44 - OPINION & ORDER

College and MIT which show distinct forms for each institution);
Deft's Exh. 3B at p. 1649 (Dr. Tygar testified that the
CollegeEDGE's MIT form was multi-page).

The XAP Legacy System generated custom forms and formatted the
data in the format requested by the institution. Id. at p. 1633
(Dr. Tygar testimony). It also allowed for multi-page
applications. Id. at p. 1637 (same).

The prior art discloses the additional element recited by
these two claims: institutions receive user information from a
third party forms servicer, derived from a customized, multiple-
page form. The additional element in these claims, when
considered in combination with invalid independent Claim 38, from
which they depend, fail to add any kind of distinguishing function
which would distinguish them from the prior art or the combination
of prior art. Given that the XAP jury considered these prior art
references in combination to invalidate several of the '042
patent's claims, there are no new issues presented as to the
combination of prior art.

###### F.   Dependent Claims 37 and 41:  Automatic Population of Forms

Unadjudicated Claim 37, which depends from invalid Claim 32,
states:

> The apparatus of claim **32** further comprising computer
> accessible memory storing a user data database that
> stores information entered onto a form by the form user
> and computer instructions for automatically inserting
> stored user data into subsequent forms requested by the
> user.

38:33-37. The notable limitations of this claim are: (1) a "user
data database that stores information onto a form by the form
user," and (2) "computer instructions for automatically inserting

45 - OPINION & ORDER

1 stored user data into subsequent forms." 38:33-77.

2    While Claim 37 separately delimits these functions, they are
3 not new in the patent because they are recited in the invalid
4 claims, as well as in the prior art.

5    First, invalid Claim 36 recites storing information, more
6 specifically, "instructions," from the first form and automatically
7 inserting this stored information into a second form. Second,
8 invalid Claim 18 recites a limitation of the third party forms
9 servicer storing the user information that has been entered onto
10 the forms. 36:61-63. Third, invalid Claim 19 recites, in part,
11 the function of "automatically inserting into the second form user
12 information previously entered onto a form by the form user."
13 37:1-2.

14    Because the functions recited by Claim 37 are already
15 invalidated as part of other invalid claims, I find that Claim 37
16 presents no new issues as to the scope and content of the prior art
17 or as to any differences between the claim and the prior art. Even
18 when Claim 37 is considered in combination with Claim 32, the
19 independent claim from which it depends, no new issues are
20 presented.

21    Plaintiff argues that the storage of user data into a user
22 data database is the distinguishing feature of Claim 37. Plaintiff
23 argues that the claimed combination allows the storage of user data
24 into a database to be accessed by a computer and automatically
25 inserted into subsequent forms. Plaintiff relies on testimony by
26 Michael Hitchcock who explained that a piece of the ApplyWeb 2
27 design, which was an improvement over the prior version of the
28 ApplyWeb system, was "coming up with a database schema to define

46 - OPINION & ORDER

1  the data elements and to, what's called atomize the data, break it
2  into its smallest pieces and store them individually, so that they
3  are accessible one by one."  Pltf's Exh. 1 at p. 558.

4      But, the prior art recites a similar function.  The
5  CollegeEDGE system used a "profile," where the applicant included
6  a variety of personal information before filling out his or her
7  first application.  Deft's Exh. 3A at pp. 1199-1201 (testimony by
8  Young Shin describing profile data which included items such as
9  name and address and stating that when a student began to work on
10 a separate, new application for a different school, the system
11 would "prepopulate" the new application with the common data).  The
12 "profile" information was stored in a database until the applicant
13 was ready to fill out applications.  Deft's Exh. 3B at p. 1647 (Dr.
14 Tygar testimony).  Once the applicant filled out the profile,
15 CollegeEdge "would use [the profile] to automatically fill in later
16 forms."  Id.

17     Dr. Tygar also testified about the XAP Legacy System which
18 took the "information the student typed in," stored "it in the
19 database," and then copied "information from the first application
20 into the second."  Deft's Exh. 3B at p. 1634.  The ApplyWeb I
21 system also stored information that the user entered on the form
22 "in the Illustra database[.]"  Id. at p. 1547 (Frederiksen
23 testimony).  The system would then read the information out of this
24 database and put it in a second form.  Id. at p. 1548.

25     Again, the function plaintiff contends distinguishes the
26 claimed combination in Claim 37 from the prior art, is taught by
27 the prior art.  There are no new prior art issues created by Claim
28 37 when considered alone or in combination.

47 - OPINION & ORDER

1    Unadjudicated Claim 41, which depends from invalid Claim 38,

2    states:

> The method of claim **38** in which receiving by an
> institution from a third party forms servicer user
> information in a format specified by the institution
> includes receiving by a first institution from a third
> party forms servicer user information in a format
> specified by the first institution, the user information
> being derived from a form customized for and primarily
> identified with the first institution, the user
> information including information that was:
>
>> posted by the form user on a previously completed
>> form customized for and identified primarily with a
>> second institution,
>>
>> stored by the third party forms servicer, and
>>
>> automatically inserted into the form customized for
>> and identified with the first institution, thereby
>> allowing the form user to enter information on a
>> form associated with one institution the
>> information being saved and automatically inserted
>> into a subsequent form associated with a different
>> institution.

15   39:6-19 - 40:1-4.

16   While lengthy, this claim discloses three primary functions:

17   (1) using a first customized form to collect user data; (2) a third

18   party forms servicer storing that data; and (3) automatically

19   populating a second form with the stored user data.[11]

20

21   [11]  The claim language is confusing.  The primary focus of
the claim addresses the automatic insertion of user information

22   from one form to another.  The way it is written, however, is
inconsistent with the final summary provision disclosing what the

23   claim allows.  The first paragraph of the claim indicates that
the user information which the first institution receives from

24   the third party forms servicer is derived from the first
institution's customized form.  Then, the claim states that this

25   information includes information the user previously completed on
a customized form for a <u>second</u> institution.  The claim continues

26   by stating that this information posted by the user on the second
institution's form, is then automatically inserted into the first

27   institution's form.  The claim then concludes by reciting the
function it attempts to achieve: the form user enters information

28

48 - OPINION & ORDER

1    Defendant contends that the functions already disclosed in the
2    invalid claims noted above in the discussion of Claim 37, and the
3    prior art defendant cited in support of its argument directed to
4    Claim 37, show that the additional limitations in Claim 41 are
5    found in the prior art or the combined prior art and that whether
6    Claim 41 is viewed singly or as part of the claimed combination
7    with invalid Claim 38, from which it depends, there are no new
8    issues regarding the prior art.

9        Plaintiff contends that the limitation of automatic insertion
10   into the second form disclosed in Claim 41 facilitates data across
11   customized application forms to reduce the amount of redundant data
12   entry by forms users, while still allowing institutions to
13   customize online forms to their preferences, using different field
14   labels and the like.  Plaintiff cites to portions of the detailed
15   description part of the patent which indicate that the claim allows
16   the forms engine to recognize when the same information is being
17   described (in a second form) by different labels or entered in a
18   different format on different application forms.  7:40-8:2.  Thus,
19   the information can be inserted into subsequent applications
20   regardless of differences in the entry format and labels in the

21

22   on a form for one institution which is saved and then
     automatically inserted into a subsequent form for a different
23   institution.  The problem is that the claim function recited at
     the end (user information being saved and then repopulated into a
24   subsequent form) is at odds with the previous recitation that the
     user information from the second institution's form is
25   automatically inserted into the first institution's form.  I fail
     to understand how the first completed form can be derived from
26   the second institution's form. Since "second" suggests that it
     follows "first," and "subsequent" refers to following in time or
27   order, it is illogical to speak of the first form being the
     subsequent one.
28

49 - OPINION & ORDER

first and subsequent applications.

I agree with defendant that the purported distinguishing feature of Claim 41 directed to automatic insertion of previously entered user information onto a second, customized form, are recited in the invalid claims and the prior art. All of the invalid claims and prior art noted above in the discussion of Claim 37 is relevant here. Additionally, while none of these invalid claims or prior art expressly address the feature allowing automatic insertion of previously stored user information into a second form even when the second form may ascribe a different label to that user information, such a feature is inherent in the disclosed system. By expressly disclosing the ability to generate customized forms for each institution, and by expressly disclosing the ability to automatically populate a second form with previously stored user data, the claims disclose a system which must be able to automatically populate that second form with the same data, regardless of its label. Thus, Claim 41 does not disclose a distinctive feature. The jury determined in the XAP case that the combined prior art invalidated the same functions which are claimed in Claim 41. Thus, Claim 41, whether considered singly or in combination, raises no new prior art issues.

G. <u>Dependent Claim 7 and Others Containing Validation Functions: 8, 9, 10, 11, 13, 14, 23, 24, 25, 26, 27, 29, 30, 34, 35, 42</u>[12]

Several of the '042 patent claims recite some kind of

_____

[12] As noted above, Claims 23, 30, and 35 are claims to which plaintiff does not challenge the application of collateral estoppel.

50 - OPINION & ORDER

validation limitation.[13]   The XAP jury invalidated the four that
were at issue in the XAP case:   Claims 20, 22, 28, and 33.

        1.    Four Invalid Claims with a Validation Function

        a.  Invalid Claim 20

       The method of claim **16** in which receiving by the
third party forms servicer over the computer network user
information and electronic payment information entered by
the user includes verifying that the user information
satisfies criteria specified by the one of the multiple
institutions to which the form is directed.

37:3-8.

        b.  Invalid Claim 22

       The method of claim **21** further comprising verifying
in accordance with validation criteria user information
on each of the multiple pages after each page is
completed.

37:11-13.

        c.  Invalid Claim 28

       The method of claim **16** further comprising verifying
in accordance with validation criteria the user
information on a completed form when the completed form
is submitted.

37:34-36.

        d.  Invalid Claim 33

       The apparatus of claim **32** in which the computer
accessible memory storing computer instructions stores
instructions for verifying, in accordance with
verification criteria, user information on each page of
a multiple page form after the page is completed.

38:10-14.

    By invalidating these four claims, the XAP jury necessarily
determined that the function of validating or verifying user and

---

   [13]   As plaintiff's own expert, Dr. David Maier, admitted at
the XAP trial, there is no "significant difference" between the
terms "validation criteria" and "verification criteria."  Deft's
Exh. 3A at p. 691.

51 - OPINION & ORDER

electronic payment information to ensure it satisfies the criteria of the particular institution, is taught by the prior art or the combination of prior art.  The XAP jury also necessarily determined that the function of validation on a page by page basis and the function of validation of a completed form, are taught by the prior art or the combination of prior art.  Finally, the XAP jury also necessarily determined that the system's storage of computer instructions for the page by page validation function, is taught by the prior art or the combination of prior art.

Defendant argues many of the unadjudicated data validation claims are invalid because they (1) include only a data validation feature already invalidated in the XAP case; or (2) include the data validation feature already invalidated in the XAP case with an additional feature that does not add patentable significance. Defendant separates this "additional" data validation feature into two categories:  (1) claims that specify the timing of the data validation feature, namely, whether it be performed on each page as it is posted, or the entire form when it is completed, or both; or (2) claims that specify the location of the validation step, whether at the client computer, server computer, or both.

2.    Validation on Page-by-Page or Completed Form Basis – Claims 7, 10, 25, 34, and 35

a.   Claim 7

Claim 7 states:  "The method of claim **6** further comprising verifying in accordance with validation criteria user information on each of the multiple pages as they are posted." 36:1-3.  Claim 7 is identical to invalid Claim 22, except that Claim 7 depends from Claim 1 via Claim 6, and invalid Claim 22 depends from invalid

52 - OPINION & ORDER

1  Claim 16.  There is no substantive difference between Claim 7 and

2  the adjudicated claim, whether the unadjudicated claim is

3  considered singly or in combination with the claims from which it

4  depends.

5              b.  Claim 35

6       Claim 35 states:  "The method of claim **32** in which the

7  computer accessible memory storing computer instructions stores

8  instructions for verifying, in accordance with verification

9  criteria, user information on the form when the form is completed."

10  38:20-24.

11       Claim 35 is similar to invalid Claim 28, quoted and discussed

12  above.  Invalid Claim 28, which depends from invalid Claim 16,

13  recites a limitation of verifying, in accordance with validation

14  criteria, user information on a completed form when the completed

15  form is submitted.

16       Claim 35 depends from invalid Claim 32 and particularly refers

17  to the part of invalid Claim 32 reciting a limitation for an

18  apparatus including computer accessible memory in data

19  communication with the processor which stores computer instructions

20  for the performance of various functions.  Claim 35 recites that

21  the computer accessible memory storing computer instructions

22  recited in invalid Claim 32, includes storage of instructions for

23  verifying, in accordance with verification criteria, user

24  information on the form when the form is completed.  38:20-24.

25  Both claims are directed to validation criteria on a completed form

26  when the form is submitted.  Claim 35 adds the storage of the

27  computer instructions to enable the stated function.  Thus, Claim

28  35 does not recite a limitation for the actual verification

53 - OPINION & ORDER

process, but rather, recites a limitation for the storage of the computer instructions for the verification process of a form when it is completed.

But, as noted above, the function of the storage of computer instructions generally is recited in invalid Claim 32.  And, the function of the storage of computer instructions for verification criteria is disclosed in invalid Claim 33.  The fact that Claim 35 addresses storage of computer instructions for verification of a completed form as opposed to the page by page verification as recited in invalid Claim 33, is an insubstantial difference.  That is, there is no substantive difference between Claim 35 and invalid Claims 28, 32, and 33, whether Claim 35 is considered singly or as a claimed combination.  Thus, collateral estoppel is appropriate.

                    c.  Claims 10 and 25

Claim 10 states:

> The method of claim **6** further comprising verifying in
> accordance with first validation criteria user
> information on each of the multiple pages as they are
> posted and verifying in accordance with second validation
> criteria user information when a completed form is
> submitted.

36:10-14.

Claim 25 states:

> The method of claim **21** further comprising verifying in
> accordance with first validation criteria user
> information on each of the multiple pages as they are
> completed and verifying in accordance with second
> validation criteria user information when the completed
> form is submitted.

37:20-24.

With the exception of one word, and the claim from which they depend, these claims are identical.  The only difference in language is that Claim 10 addresses page by page validation as each

54 - OPINION & ORDER

1  page is "posted," and Claim 25 addresses page by page validation as

2  each page is "completed."    The difference between posting and

3  completing is insubstantial.

4      The function disclosed by the two claims is verifying

5  information on a page by page basis and then separately verifying

6  information once the form is completed.  As can be seen from the

7  previous discussion, this function is not "additional" or new

8  because it is disclosed in other, invalidated claims such as Claims

9  22 and 28.

10     These claims do, however, introduce the new feature of first

11 and second validation criteria.  Defendant argues that the concept

12 of different sets of validation criteria is recited in the prior

13 art, or the combination of prior art.  I agree.

14     Validation criteria appear in several prior art references.

15 First, ApplyWeb I had the ability to run data validation on eight

16 fields to ensure that they were filled in.  Pltf's Exh. 1 at p.

17 1757 (testimony by Hitchcock).

18     Second, CollegeEDGE included an "Inspector" feature which,

19 after students clicked on it, would automatically validate the

20 information on the particular page that the student was currently

21 viewing.  Deft's Exh. 3A at p. 1217 (testimony of Shin that

22 CollegeEDGE had "quality checking or data validation" which "would

23 not let students submit an application unless it passed the data

24 validation rules."); Id. at p. 1218 (Shin testimony that when

25 CollegeEDGE's inspector button was pushed, the system "then ran

26 through the data validation rules and will show you anything that

27 failed the data validation rules so you can fix them."); Id. (Shin

28 testimony that the inspector feature also operated when the user

tried to submit the application "so that you could not submit the application until those data validation rules were passed."); see also Deft's Exh. 3B at p. 1648 (testimony by Dr. Tygar that CollegeEDGE had the ability to do data validation on a page by page basis).

Allen Firstenberg testified that the XAP disk system checked data entered by the user in each field. Deft's Exh. 3A at pp. 1260-61. He explained that in the disk system and in the XAP on-line system, every data field was checked to make sure it was complete so that where there was a defined format, such as a social security number or telephone number, the system made sure it was consistent. Id.

Firstenberg further explained the validation feature in the XAP system:

> [t]he student would see the beginning of the application and they would start typing in their responses. If -- if and when they were finished with one page, they would hit "next page", and if they had made a mistake, if it was -- if the answers were inconsistent or if they left something out or if the format was incorrect, the system would tell them before they went on to the next page.
>
> They would do this page after page until the entire application was completed, in which case they would hit "submit." The system would again check the entire application for consistency across pages, and if everything was okay, . . . .

Id. at p. 1264.

Jessica Wagoner testified that the XAP system checked previous answers and actually tailored data validation in response to future questions. Deft's Exh. 3B at p. 1297. She explained that if information in a required field was not entered, the user would get an error on the screen when the user tried to proceed to the next screen. Id. Additionally, the program would know that a required

56 - OPINION & ORDER

field for a first-time freshman would be an SAT score, but this was not a required field for a transfer student.  <u>Id.</u> at pp. 1297-98.

The XAP system also incorporated a dynamic validation system. Frank Tansey described that the XAP system had multiple pages or screens.  <u>Id.</u> at p. 1332.  When asked if the system could check across screens, he answered:

> Yes. . . .  Frequently we would collect information on one screen, and because what we were trying to do was to make this as logical as possible for the student, it might be more appropriate for us to ask the second question, the follow-up question within the context of a second or third or a fourth screen.

<u>Id.</u> at pp. 1332-33.

The XAP system also performed a final validation when the application was submitted.  <u>Id.</u> at p. 1471.

The prior art includes the features of data validation recited in Claims 10 and 25.  The prior art recites the function of data validation at different stages of the process - both page by page and when the form is completed.  While the ApplyWeb I system disclosed a fairly limited set of data that was validated, the prior art includes CollegeEDGE, which had "rules," easily understood as criteria, for data validation of a much wider scope and on both a page by page or screen by screen basis, and when the form was completed.  Additionally, while the page by page validation feature in CollegeEDGE appears to have been activated by the "Inspector" button, the evidence suggests that it validated the completed application automatically.  Even if it did not, the XAP system's validation feature was automatic.

The combination of the prior art teaches the feature claimed in Claims 10 and 25.  The XAP jury already determined that a person

57 - OPINION & ORDER

of ordinary skill in the art would have been motivated to combine these prior art references and thus, it found all of the claims presented to it for adjudication, invalid.  This conclusion by the XAP jury included the function of validating of the information on a page by page basis (Claim 22) and of the completed form (Claim 28).

Plaintiff contends that the importance of the second validation feature found in Claims 10 and 25 to the claimed combination as a whole is that the "[c]laimed combinations allow the use of a first and second set of validation criteria to ensure multiple layers of consistency in user information entered on forms, benefitting institutions and users with more accurate application forms being submitted."  Pltf's Mem. at pp. 11-12.

I disagree.  As noted, the prior art teaches all of the limitations in Claims 10 and 25 and even when looking at the claimed combinations as a whole, that is, with the claims from which Claims 10 and 25 depend, the additional recitation in Claims 10 and 25 of first and second validation criteria do not distinguish these claims from the prior art.

It is clear from the language of the claims themselves that the terms "first" and "second" validation criteria refer to validation occurring first on a page by page basis, and second, when the form is completed.  Claim 10, quoted above, the first claim to mention first or second validation criteria, recites two functions:  (1) verifying "with first validation criteria," user information on each of the multiple pages as they are posted; and (2) verifying "with second validation criteria," user information when the completed form is submitted.  Thus, first and second

58 - OPINION & ORDER

1   validation criteria carry no function separate from what is

2   implicitly disclosed in the claims which expressly recite

3   verification or validation on a page by page basis as distinct from

4   verification or validation of the completed form.   Accordingly,

5   the examination of the limitations in Claims 10 and 25, whether

6   singly or in as part of the claimed combinations as a whole,

7   produces no new issues regarding the prior art.

8                   d.  Claim 34

9       Claim 34 states:

10      The apparatus of claim **33** in which the computer
        accessible memory storing computer instructions stores
11      instructions for verifying, in accordance with second
        verification criteria, user information on the form when
12      the form is completed.

13  38:15-19.

14      This claim is almost identical to Claim 35, discussed above.

15  Claim 34 covers an apparatus while Claim 35 covers a method.  Claim

16  34 also refers to "second validation criteria."  Both claims

17  address storage of computer instructions verifying user information

18  on the form when the form is completed.

19      For the reasons explained above in the discussion of Claims 35

20  and then Claims 10 and 25, I conclude that the function expressed

21  in Claim 34 is found in other invalid claims and is recited in the

22  prior art.  Whether considered alone or in combination with the

23  claims from which it depends, no new prior art issues arise.

24              3.  Validation at Server and/or Client Location -
                    Claims 8, 11, 14, 23, 27, and 30
25
26      Claims 8, 11, 14, 23, 27, and 30 all address verifying user

    information and recite where such verification occurs.
27
28      Claim 8 recites a function of verifying information, on a page

    59 - OPINION & ORDER

by page basis, at either a client computer or a server computer. It states: "The method of claim **7** in which verifying in accordance with validation criteria user information on each of the multiple pages as they are posted includes verifying the user information at a client computer or at a server computer." 36:4-7.

Claim 11 also addresses verification of information at the client computer or server computer, but it recites more specifically the location of verification by the first or second validation criteria. It states: "The method of claim **10** in which verifying user information in accordance with first validation criteria includes verifying user information at a client computer and in which verifying user information in accordance with second validation criteria includes verifying user information at a server computer." 36:15-20.

Claim 14 is similar to Claim 8 except that it addresses verification of the completed form: "The method of claim **12** in which verifying in accordance with validation criteria the user information on the completed form includes verifying the user information at a client computer or at a server computer." 36:27-30.

Claim 23 addresses the verification of information at either the server computer or the client computer, but not restricted to either a page by page basis or the completed form: "The method of claim **22** in which verifying in accordance with validation criteria includes verifying the user information at a client computer or at a server computer." 37:14-16.

Claim 27 is identical to Claim 11, except that Claim 11 recites that it depends from Claim 10, and Claim 27 recites that it

60 - OPINION & ORDER

depends from Claim 25.  37:28-33.  Claim 30 is identical to Claim 14, except Claim 14 recites that it depends from Claim 12, and Claim 30 recites that it depends from Claim 28.  37:40-43.

Invalid claims 20 and 28 disclose a "server-side" verification function.  As noted above, invalid Claim 20 recites the function of the third party forms servicer receiving and verifying information. Because "third party forms servicer" is "[t]he business entity hosting the forms engine software," Pltf's Exh. 3, the disclosure in Claim 20 that the third party forms servicer is verifying information means that the verification is performed by the server computer.  See also 3:48-52 (the detailed description of the patent noting that ". . . a third party application servicer[] uses relational databases for storing information and communicates with applicants and institutions over the World Wide Web[,]" thus indicating that the third party forms servicer sits at the server side of the client - server architecture).

I agree with defendant that the function of server-side verification of information is recited in invalid claims.  I further agree with defendant that both client-side and server-side verification, along with first and second validation criteria, is found in the prior art.

Plaintiff does not dispute that the XAP Legacy System, CollegeEDGE, and ApplyWeb I were all web-based systems, using a client-server architecture, where the client is the applicant/user's computer and the server is the online application company's computer.  The testimony and record in the XAP case firmly establish that the client-server architecture existed in the prior art.  E.g., Deft's Exh. 3A at p. 1214 (testimony by Shin that

61 - OPINION & ORDER

the CollegeEDGE system relied on a web browser used by the student applicant, which would interface with the system's web servers, the system that actually hosted the applications); Deft's Exh. 3B at pp. 1521-22 (testimony by Frederiksen that ApplyWeb I was designed to operate over the Internet with the server computer being the computer system at ApplyWeb and the client system being the user's computer, wherever the user was located, such as at home or a library, etc.); Id. at p. 1614 (testimony by Dr. Tygar that the XAP system used a "server computer," referring to "XAP's computer," and a "client computer," referring to the "student's computer").

Evidence in the XAP case also reveals that in the XAP system, the client computer and the XAP computer performed data validation. Tansey testified that in the XAP system,

> [e]verything was data validated. You could not finish the application until actually multiple checks had gone on with the application. There was -- on each screen there was a browser based, a local validation of that screen information, but at the end of the process, because it was multiple screens, there was an overall validation that was done back at the server. It was only when all the information was validated and finished that the application, in fact, could be finalized by the student.

Id. at p. 1347.

This testimony shows that in XAP's system, a browser or client computer performed screen by screen validation, and the company's server performed validation of the completed form. With this, the elements recited in Claims 8, 11, 14, 23, 27, and 30 are all recited in either invalid claims or the prior art. That is, these claims reveal the function of data validation being performed at a user or client computer and at the server's computer, and the data validation being done on a page by page basis under first

62 - OPINION & ORDER

validation criteria, and on the completed form by second validation criteria.

When I examine each of these claims in combination with the claim or claims from which it depends, I find that any additional elements raise no new issues regarding what a factfinder would have to decide in determining whether the claimed combination is distinguishable from the prior art.

> 4.    Validation Criteria from Institution:  Claims 9, 13, 24, 26, 29, and 32

Claims 9, 13, 24, 26, 29, and 42 all refer to validation criteria specified by the institution.  Claims 9, 13, 24, and 29 are identical, except for the reference to the claim from which they depend:  "The method of claim [] in which the validation criteria is specified by the institution to which the form is directed."  36:8-9 (Claim 9); 36:24-26 (Claim 13); 37:18-20 (Claim 24); 37:37-39 (Claim 29).

Claim 26 has a slight variation:  "The method of claim **25** in which the first criteria, the second criteria, or both criteria are specified by the institution to which the application is directed." 37:25-27.  It is obvious from examining Claim 25 that "first criteria" as used in Claim 26, means "first validation criteria," and "second criteria" as used in Claim 26, refers to "second validation criteria."  37:20-24.

Claim 42 is also a bit different, because it depends from invalid Claim 38 which is written to stress the receipt of information by the third party forms servicer.  Thus, Claim 42 states:  "The method of claim **38** in which receiving by an institution from a third party forms servicer user information in

a format specified by the institution includes receiving information that was verified by the third party forms servicer as satisfying criteria specified by the institution." 40:5-9.

First, I agree with defendant that the difference between Claim 42 and Claims 9, 13, 24, and 29 is not substantive because in all of these claims, the function disclosed is verification of information by validation criteria specified by the institution.

Second, I agree with defendant that as a result of my conclusion discussed above (that "first validation criteria" and "second validation criteria" are in the prior art and these additional validation-related elements do not distinguish those claimed combinations from the prior art), the presence of "first criteria" and "second criteria" and "both," in Claim 26 is an immaterial distinction from the invalid claims.

Third, I further agree with defendant that any element reciting a function of the institution specifying the validation or verification criteria for validating or verifying information that the user inputs, is taught by the prior art. Shin testified that in the CollegeEDGE system, the system's data validation was driven by the schools. Deft's Exh. 3A at pp. 1217-18 (noting that CollegeEDGE "probably helped the schools come up with the list [of data validation criteria], but it was school driven[.]").

The ApplyWeb I system worked from a "list of the institution-specific required fields[.]" Deft's Exh. 3B at pp. 1550-51 (Frederiksen testimony). The system "check[ed the fields] by reading that list out of the database to make sure, for instance, if for some reason the institution wanted your mother's maiden name, they could put that in the database, and then for that

64 - OPINION & ORDER

particular institution that check would be made."   Id.

Firstenberg testified that the XAP system accommodated specific types of error checking that the college wanted.   Deft's Exh. 3A at p. 1280.

Plaintiff contends that the importance of the element in Claims 9, 13, 24, 26, 29, and 42 regarding the institution specifying the validation/verification criteria, to the claimed combination as a whole, is that the claimed combination allows the use of a set of validation criteria specified by the institution receiving the form to validate data entered in institution-specific fields for consistency and accuracy.

I find no significance in the combination of this additional element with the rest of the claim limitations.   The presence of this additional limitation in the claimed combination does not change the relationship of the prior art to this claim.   The alleged notable function performed when the additional element is considered with the claimed combination is taught by the prior art. The additional element presents no new issues regarding the distinction of the claimed combination from the prior art.

H.   Dependent Claim 40: Processing Fee for Third Party Servicer

Claim 40 states:

The method of claim **38** [in] which receiving an electronic payment associated with the customized form includes receiving an electronic payment that includes a form fee minus a form processing fee retained by the third party servicer.

39:1-5.  The function disclosed by this claim is the ability of the system to deduct from the fee received as an electronic payment, a form processing fee based on a "per application" commission which

65 - OPINION & ORDER

1  is then retained by the third party forms servicer.  No other
2  claims include an explicit commission feature.

3       I agree with defendant, however, that the function is found in
4  the prior art.  First, the evidence in the XAP trial made clear
5  that plaintiff operated on a commission-based business model.
6  E.g., Deft's Exh. 3A at p. 207 (testimony by Michael Sexton of
7  Lewis & Clark College that college received the application fee
8  from CollegeNET, less a $5 processing charge); Id. at p. 770
9  (testimony from Patrick Carmody, plaintiff's vice-president of
10 sales, that for use of the ApplyWeb system, plaintiff charges $5 or
11 15% of the application fee that plaintiff collects on the
12 institution's behalf, and that plaintiff remits the fee it
13 collects, less its fee, to the institution); Deft's Exh. 3B at p.
14 1704 (testimony by Matthew Lynde that the only source of revenue
15 for plaintiff was to charge per application, somewhere between 5
16 and 15 percent of the institution's application fee).

17      Second, plaintiff's subscriber agreements from 1995 and 1997
18 show that plaintiff deducted $5 or 15 percent of the application
19 fee for every application processed through ApplyWeb I.  Deft's
20 Exh. 5 at p. 2 (March 25, 1997 agreement with Lewis & Clark College
21 which includes credit card collection by plaintiff of the full
22 college application fee for each application with remission of the
23 fees collected to the college by the 15th of each month, less 15
24 percent, or a minimum of $5 per fee); Deft's Exh. 6 at p. 2
25 (December 21, 1995 agreement between plaintiff and Virginia Tech
26 containing same fee agreement); see also Deft's Exh. 3A at p. 588
27 (Hitchcock testimony that ApplyWeb I allowed applicants using the
28 system to pay by credit card, with CyberCash handling the

66 - OPINION & ORDER

1   verification of the credit card information); Exh. 3B at p. 1408
2   (testimony by Batcheller that users of the ApplyWeb I system
3   entered their credit card number which transmitted the information
4   to CyberCash, which then transmitted the payment to plaintiff,
5   which then paid the institution).

6       Plaintiff argues that the additional element in Claim 40
7   regarding the electronic payment, including a "form fee minus a
8   form processing fee retained by the third party servicer," is
9   important to the claimed combination because this element, when
10  viewed in combination with other advantages of the invention,
11  further reduces the burden on institutions in processing payments
12  as the third party servicer's fee may be already deducted prior to
13  receipt of the form fee by the institution so that subsequent
14  accounting and payment of forms servicer might be avoided.

15      I disagree.  The "further reduction" of the burden on the
16  institution was performed by ApplyWeb I, as reflected in both the
17  testimony and the written agreements.  The additional element, when
18  viewed with the claimed combination as a whole, does not
19  distinguish the claimed combination from the prior art.

20      I.  Claims 15, 31, and 44:  Computer Instructions[14]

21      These claims all address the system's inclusion of computer
22  instructions for completion of functions.  The all state, with the
23  exception of the claim to which they refer, "[a] computer readable
24  media comprising computer instructions for performing the steps of
25  claim []."  36:30-31 (Claim 15, referring to Claim 1); 47:44-45

26  _____

27      [14]  As noted above, Claims 31 and 44 are claims to which
    plaintiff does not challenge the application of collateral
28  estoppel.

67 - OPINION & ORDER

1  (Claim 31, referring to invalid Claim 16); 40:17-18 (Claim 44,
2  referring to invalid Claim 38).

3      Defendant argues that these claims recite only an
4  insubstantial limitation which lends no patentable significance.
5  More specifically, defendant contends that Claims 15, 31, and 44
6  recite nothing more than the application of modern computer
7  technology to a concept that is otherwise invalid as obvious.
8  According to defendant, programming a computer to perform an
9  otherwise obvious task is an insubstantial addition and thus, these
10 claims are invalid.

11     I agree with defendant.  The XAP jury invalidated Claims 16
12 and 38.  I have concluded above that Claim 1 is invalid as a result
13 of collateral estoppel.  A claim otherwise invalid as obvious,
14 either directly or via collateral estoppel, does not become
15 patentable merely by delineating the implied prerequisite that the
16 computer system which is the basis of the patent as a whole, must
17 contain computer readable media with computer instructions for
18 performing the steps of the claims.  See In re Comiskey, 499 F.3d
19 1365, 1380 (Fed. Cir. 2007) (noting that certain claims at issue
20 merely added "a modern general purpose computer to an otherwise
21 unpatentable mental process" and other claims "merely add modern
22 communication devices."); see also Leapfrog Enters., Inc. v.
23 Fisher-Price, Inc., 458 F.3d 1157, 1161 (Fed. Cir. 2007) (in
24 affirming district court's determination of obviousness, court
25 noted that applying modern electronics to older devices had been
26 commonplace for years and thus, "[]accommodating a prior art
27 mechanical device that accomplishes that goal [one of having a
28 child associate the sound of a letter pushed by the child with the

letter itself and be able to sound out the word one letter at a time to learn to read phonetically] would have been reasonably obvious to one of ordinary skill in designing children's learning devices.").

CONCLUSION

Defendant's motion for summary judgment based on collateral estoppel (#682) is granted.  All claims of the '042 patent, not litigated in the XAP trial, are invalid.

IT IS SO ORDERED.

Dated this  28th day of October      , 2008


                                    /s/ Dennis James Hubel
                                    Dennis James Hubel
                                    United States Magistrate Judge

69 - OPINION & ORDER